4-15-0748 People v. Larry Steeples Appearing for the Appellant Defendant is Attorney Benjamin Wimmer and Appellate is Attorney David Manchin Benjamin Wimmer of the State Appellate Defender's Office on behalf of the defendant, Larry Steeples. This court should reverse Mr. Steeples' conviction and remand for a fitness hearing for a newly assigned trial judge, because the trial court went against the manifest weight of the evidence in finding that Steeples was fit to stand trial and, in the process, abandoned its role as a neutral fact finder at the fitness hearing. The relevant fitness standard in this case was set forth by the U.S. Supreme Court in Dusky in 1960. In order to be fit to stand trial, defendant must, among other things, be able to consult with defense counsel with a reasonable degree of rational understanding. Now, in this case, in the motion of defense counsel, and without objection from the state, the trial court appointed Dr. Marilyn Marks Frey to examine Mr. Steeples and opine whether he was fit to stand trial. She did so and opined that he was not fit to stand trial because he failed to satisfy the Dusky standard. More specifically, she opined that her testing revealed that he suffered from an executive functioning deficit. He was unable to adequately process stimuli, information rather, and overwhelmed with information or stimuli. Putting things a bit more colloquially, Dr. Frey stressed that this was consistent with defense counsel's complaint that Steeples was unable to adequately concentrate or focus when she consulted with him about the case in an attempt to prepare a defense. Now, on its face, Dr. Frey's opinion was credible, internally consistent, and sufficient to distinguish Steeples from a run-of-the-mill difficult client who simply doesn't want to cooperate with defense counsel. Dr. Frey didn't indicate that his failure to concentrate was volitional. She believed it was a genuine cognitive deficit, which she speculated, although could not confirm, may have had an underlying neurological cause. Similarly, Steeples' mental impairment was not minor or insignificant. On the clinical side of things, Dr. Frey reported that she administered what was called the booklet category test, a three-stage test with three stages of escalating difficulty designed to assess Mr. Steeples' information processing abilities. Steeples essentially flat-lined at the second stage of the test, responding incorrectly to every stimulus presented before he became so frustrated and agitated that he refused to continue. On the more practical side of things, in addition to defense counsel's repeated complaints that her inability to adequately communicate with Steeples was hamstringing her preparation of the defense prior to trial, there was evidence in open court of the difficulties that was caused by this, such as Steeples, at one point for the first time, revealing the existence of potential defense witnesses for the first time in open court rather than in a privileged attorney-client conversation. And most obviously, Steeples, apparently to defense counsel's surprise, was essentially confessing to murder at the end of his direct examination testimony. So this was, at least according to Dr. Frey, a significant handicap that left him unfit to stand trial. Now because there was a facially credible opinion that Steeples was unfit to stand trial, a reasonable fact finder couldn't have just rejected her opinion out of hand. In order to reject her opinion, there needs to be some evidence in the record that would provide a basis for concluding that her opinion was unsound. That's set forth by the Illinois Supreme Court in McKinstry in 1954, followed most recently to my knowledge by the Illinois Appellate Court in Lucas in 2009. It's set forth in greater detail in the briefs. There wasn't evidence in the record here that would justify a fact finder in disregarding Steeples' opinion. The trial court relied chiefly on three factors in doing so. First, the trial court and the state both frequently construed Dr. Frey's opinion as being that Steeples was not fit to stand trial because there was a risk that he would engage in angry, explosive behavior in the courtroom. Even if that were a basis for finding somebody unfit, which without more it's not, it's not an accurate reflection of Dr. Frey's opinion. Dr. Frey did say that she was concerned with Steeples' explosive behavior and it's pretty much undisputed that Steeples does have a history of explosive behavior and anger issues. But that wasn't the basis of her finding him unfit. The basis was the effective process of his work. Although she did note, for instance, that he appeared to become agitated, perhaps on the brink of an outburst when he refused to continue with the booklet category test, she stated that he had begun to answer all basic stimuli on the test before he was on the verge of an angry outburst. And indeed, she also stated that she received what she described as a very low score of 9 out of 25 on the portion of the MSE2 test designed to measure memory with interference, the ability to recall recently heard information after being asked to deal with something else. And there was no report that Steeples had any sort of anger in connection with that test, and despite that, it also revealed a related processing problem. In short, although Dr. Frey did note that Steeples had, you know, anger issues, he was not unfit because of the anger issues. He had the anger issues in part because of the underlying mental deficit that rendered him unfit. In your brief, you assert that Dr. Frey offered a, quote, facially credible opinion that he was unable to rationally assist defense counsel. If you don't cite to the page of the record where that appears, and I don't know where it is, it seems to me that that's really one of the important aspects of this question. She may have said that she thought he was unfit to stand trial, but the question is, can he assist in his defense? Is he able to consult with a lawyer with a reasonable degree of rational understanding, and at what point in her report does she address that? It's in the record, page 139. It's where she sets forth the fact that he suffers from an executive functioning deficit, explains roughly what that is, and stresses in italics that it's consistent with defense counsel's report that he's unable to adequately focus and concentrate when she's attempting to consult. How about unable to rationally assist defense counsel? That's her quote. That's correct. The phrase rationally able to assist defense counsel doesn't appear in those words in Dr. Frey's report. She doesn't quote Dusky. But it is the obvious implication of her opinion that he's suffering from an executive functioning deficit and is unfit because he's unable to communicate adequately with defense counsel. To briefly go through two other major factors that the trial court relied upon, there was the opinion of Dr. Boyd finding Schieffel's fit to stand trial in a case that was brought in 2006-2007. The Boyd opinion is not inconsistent with the basis of Frey's opinion, in large part because he wasn't looking closely at the issue of Schieffel's memory, information processing ability, or ability to aid his attorney. Schieffel was referred to Boyd on the basis of prior diagnosis of bipolar disorder. There's nothing in the record indicating that Boyd performed the sort of testing that Dr. Frey did, and the only indication we have they examined Schieffel's memory at all was basically they said his memory was grossly intact, indicating that he didn't see any problem, but he wasn't looking very closely. Even if it were otherwise relevant, it is seven years old. A person's fitness can change over time. Finally, the trial court relied heavily on the fact that Mr. Schieffel was able to function in certain contexts other than an attorney-client conference about the case, such as two weeks working at a construction job, various days in the Illinois Department of Corrections, and appearances in court. However, as set forth by the Illinois Supreme Court in Easley from 2002, context is critical in determining whether or not a person's ability to sort of function in a given context suggests fitness to stand trial. To what extent can we, including the trial court, consider the defendant's conduct through trial itself as pertaining to this issue? I mean, the trial court can consider the defendant's behavior in the courtroom, both up through the fitness hearing and through the remainder of the case, so long as it's relevant to the issue of the defendant's fitness. Specifically, the transcript contains an awful lot of pages, direct examination, cross-examination, redirect examination, in which the defendant responds appropriately to questions, does he not? Correct, Your Honor. What inference could the trial court, should this court draw from that? I don't think it provides a sufficient basis to conclude that he's not suffering from the- That wasn't my question. What inference can we draw from that? The inference thing, doesn't that support the trial court's conclusion? Okay. No, Your Honor. Well, because, again, it's the nature of the conversation that you'd be wanting to have in a sort of searching conversation with the defendant in an effort to examine the potential underlying evidence in the case. So a guy can have 100 pages of rational discourse on examination and yet not be able to cooperate meaningfully with his lawyer? Well, again, it's not- first of all, I wouldn't say it's 100% sort of rational. First of all, it's just a general, you know, tell me your story, complain about Gina. He's obviously very good at complaining about Gina. There's about 30 pages of him just going over various text messages he sent to Mrs. Jefferson, which at points is borderline incomprehensible what he's trying to say and ultimately results in him, you know, essentially confessing to murder, which, again, defense counsel appeared not to expect given that she just asked him the same question twice in a row. His direct examination testimony, the mere fact that he's able to go on and on, basically sort of giving his story, isn't an indication that he's able to, you know, focus on other issues that defense counsel might need to examine as part of preparing defense, knowing more information about Jefferson unconnected to him, people that she might have fought with on previous occasions, which some evidence of that did manage to come out at trial. But just the sheer length of his testimony, dozens on its own, supported an inference that he's able to have, you know, productive attorney-client conversations preparing a case. Indeed, the fact that he essentially, you know, confessed on the stand suggests that, you know, the conversations with defense counsel were in large part not very productive. I mean, it's unfit to mistakenly say the truth, assuming that's the truth? Not necessarily unfit to say the truth. Obviously, you know. You mean a more competent defendant wouldn't understand his purpose at that point is to lie? Obviously, you know, it's illegal to lie on the stand. I mean, what do you say about, gee, he wound up ultimately admitting to this crime? Well, maybe if he did it, it would be bad tactics, but I mean. Extremely bad tactics. But, you know, he just got confused for the moment and realized he's testifying under oath and all that. Now, you say that repeatedly, and I find it a little bit troubling that the sign of unfitness is a guy tells the truth. Isn't that the bottom line? Essentially, what's your argument? Let's assume he admitted to the crime. That's really what you're arguing, isn't it? It's the fact that he's testifying at all, frankly, that he's going to be confessing. I mean, as you put it a moment ago, it's bad tactics, but it's alarmingly bad tactics. I mean, if I had a client that had informed me that he had, you know, committed the crime, I would strongly advise him not to testify. For all we know, he may have disregarded that, but, I mean, there's nothing in the record to suggest that. Also, changing the subject, when you talk about can he cooperate with his lawyer and follow and assist in his defense and all that, doesn't the record show that sometimes when he was testifying and there was an interruption because of an objection and the trial court ruled on it, that the defendant was able to pick up where that question left off? Yes, that's correct. Okay. Now, call me crazy, but isn't that indicative of a guy who is, for lack of a better way to put it, not exactly out of touch with what's going on in reality and being able to converse about a matter of importance? Well, then the issue is not that he's completely out of touch with reality. I mean, there's no issue here. Now, follow a dialogue. Tell the story. I mean, you know, can he cooperate with his lawyer? Part of this should mean his lawyer, as I've seen, I was a trial judge and had several of these kinds of cases. This is a guy who's on a different planet. He can't follow a story, can't communicate, can't keep up an explanation or a dialogue. Here we have a fellow who not only apparently can do that but remembers where he was after the trial court rules on an objection. Isn't that inconsistent with the notion of a fellow who can't follow questions or a dialogue with his lawyer well enough to be able to meaningfully communicate? No, Your Honor. I mean, the notion of memory with interference that was set forth by Dr. Frey, in her opinion, is that a defendant has to be able to return to an initial subject after dealing with something else. It's not his job to respond to the objections. That's defense counsel's job. So, I mean, there's no indication that, you know, he's being asked to change his focus in order to deal with this. He's simply waiting. Counsel, I was a trial judge a long time, and I've had the experience where witnesses are at the witness stand to ask a question. Objection, judge. That's improper, blah, blah, blah, discussion back and forth. Objection overruled. You have my answer. I've had lots of witnesses who then look at me and said, would you repeat the question? Where were we exactly? You know, I mean, that would be the norm. It's the exceptional witness with exceptional concentration powers to pick up like that. Isn't that true? I mean, I haven't obviously practiced as long. But wouldn't you expect it to be the case where a witness and hearing this discussion between counsel and the court might have lost his train of thought, or where exactly were we going, or what was the question? This defendant appears to be, at least in a few instances, fully capable of picking up his train of thought where he was. Well, again, I mean, there's no indication that he put it down or was particularly paying attention to the, you know, objection colloquially between the attorneys and the court. I mean, furthermore, just in general, even if. So what we're evaluating was the trial court's ruling against the manifest weight of the evidence finding him fit. Aren't these things I've been raising with you all supportive that the trial judge was right? I mean, no, Your Honor. I mean, they don't specifically address his ability to focus through multiple topics of conversation that you would expect to find in a consultation between attorney and client. Consultations between attorney and client don't occur in open court, and they aren't like what occurs in open court. I interject just for a second. Justice Steinman, I would incorporate exactly what he said in that it is the exceptional witness who does track and answer questions after the scenario which you brought up, but I also certainly understand that defense counsel and your questioning of the defendant's fitness and not following what is likely counsel's advice not to make those admissions on the stand. So I think that point is not lost on the panel that, in fact, that was a red flag. Thank you, Your Honor. But moving on just briefly, even if there were a basis here on which a reasonable fact finder could have chosen to disregard, I'm sorry, not to reject Dr. Frey's opinion, the trial court here wasn't acting as a neutral fact finder at the time he did so. And this is most evident by the way the trial court began the hearing. Essentially, by refusing to postpone it to allow Dr. Frey to provide live testimony and indicating right at the outset that he believed appointing Dr. Frey had been a mistake. It was contrary to his own observations. Mr. Wimmer, you'll have time to rebuttal. Thank you. Mr. Manson. Good morning, Your Honors. May it please the court, counsel. This case presents a somewhat unusual fitness case. In most cases this court sees is did the parties enter into the right kind of stipulation and did the trial court conduct its own independent examination or did they just rubber stamp the expert's opinion? What we have here is a trial court who carefully considered all the evidence, carefully considered an expert's report that never stated in any shape or form that the defendant was unfit as unable to assist his attorney. Let's pick up where Mr. Wimmer was going at the end here. You'll have time in rebuttal to respond to this. Did Judge Schick overstep or engage in any type of investigative process that was outside the rules? No, Your Honor. He followed the statute exactly as it should be followed. He has a motion by defense counsel to appoint an expert to determine if there's a doubt of fitness. The motion only says defendant has a prior history. The trial judge would not have been required to appoint an expert at that point. But out of caution, he appoints the expert. He then gets back an expert's opinion that says defendant has memory problems and may be unfit because of a risk of disruptive proceedings. Again, that report would not have required an evidentiary hearing. It could have just dismissed it on that basis saying that there's no bona fide doubt of fitness established by this report. But again, the trial court holds the hearing. The statute expressly says that a trial court in a fitness hearing can call its own witnesses and conduct its own investigation. How does the trial judge find out about Mr. Drake and the employment defendant had with that construction company? I don't recall how he found exactly Mr. Drake. It was mentioned in the expert's report as far as the prior employment, and I think it must have been listed in the request for appointment of a public defender as far as, you know, what are my assets and liabilities. The record really doesn't show how, to my recollection, how he found Mr. Drake. And what Mr. Drake, again, the expert relied upon the defendant's statement as to his prior history in determining whether or not the defendant was fit or not. So looking into the defendant's history of employment would, in fact, seem to be a reasonable thing. And it could go either way. You have the employer come and testify, this guy's a nutcase. He couldn't get along with anybody. He couldn't follow directions worth a darn. I had to fire him after two days because he just couldn't be worked with. Or you have the thing he hasn't ever had, and I wish he could have stayed a little longer. So it's information that doesn't point one way or the other and tell us before the court to determine, you know, okay, what does this information mean? The statute says the court can call its own witnesses and make its own investigation. The trial court did this. He told the parties the exact information he was seeking. He had no opportunity to examine it. The defense counsel agrees that the trial court consider the transcripts of the recent proceedings and the expert's opinion from the other earlier expert. So to say that this judge is going above and beyond what the statute says he can do is just incorrect. He's doing exactly what the trial court is allowed to do. And there's no prejudging of this case. I mean, if there's any prejudgment, he would have just kicked out that first portion of the expert because the simple statement he has a prior mental history is not enough to require any kind of inquiry. So this is a judge who, as he said, in an excess of caution, giving the defendant a break, trying to say, okay, this is my job. It would be a violation of your rights for me to allow you to go to trial with being unfit. That's why we're conducting this proceedings. And the manner in which he did so I think was exemplary. This is exactly what the statute calls for him to do. We have an expert opinion that doesn't say he cannot assist his attorney. We have the investigator and the defense counsel to say, this guy is hard to work with. I had to talk with him for five hours about this one report. We have the investigator so that he was all over the place, but he gave me names of people to investigate. His conduct in all the hearings, both before and after, and in People v. Lucas, which is the side of my brief, that's the case that says you can consider the defendant's testimony at trial and determine whether the trial court was correct in its determination. Based upon all the defendant's conduct in the trial court, the representations of the attorney and the investigator, the defendant's own statements in all the many hearings before and after, the trial court's determination that this defendant was fit to stand trial was not contrary to the manifest way that the evidence. The only expressed opinion as to fitness given by the doctor, it was in his explanation to the attorneys for his supplemental report, which says he can become fit with medication that will prevent outbursts in trial. The expert's concern was not that he cannot assist his attorney in preparing for trial, it's that this guy is going to blow up in court. That is simply not the standard for unfitness. The trial court was not required to accept that opinion, nor was he required to draw the implications suggested by defense court, just because he's got numerous problems, he's therefore going to have problems working with his attorney. Yes, there were problems, given the attorney's statement at that fitness hearing, but if you look over the whole course of the case, there were five or six hearings before this where a counsel has said nothing about having trouble working with this guy. The colloquy at the pre-trial hearing where the defense says, I want a new attorney, my present attorney's not cooperating with me, she's not visiting with me often enough, and then there's a colloquy in court as to, okay, I missed three visits because my car broke down and I was busy with other things and just couldn't get there. It shows that the defendant can and could cooperate and assist his attorney. His conversations with the expert, while he has trouble on memory tests, he tells the expert his criminal history, why he was in jail before, he tells him his prior employment history, he tells him the history of this offense, lays out the offense as basically self-defense. That's how the expert phrases it, if I recall correctly. So this is not a guy, it's not a defendant like, I forget the name of the case cited by the defendant where the defendant has total amnesia about everything and cannot remember anything. It says, okay, because you have total amnesia about everything, you're not fit for trial because you simply cannot assist your attorney. Here we have a guy whose memory regarding events is established by his statements to the experts, his statements to his fellow inmates, and then his testimony trials. That shows his memory and recollection as to what, as to the events that he's charged with, is perfectly intact. We haven't talked about Sean Beck here. I'm not sure, reading the briefs, just how much weight Judge Schick put in. He didn't. He actually said that this guy, I don't really put much weight on it. It's just information that's there. But, again, it's evidence that was presented by the state without objection. It's like the judge said. It's information that's there. You can plug it in for whatever it's worth, and there was no error in receiving that. The fact that this defendant has the wherewithal to plan a PTSD defense shows that he is fit, shows that he is capable of participating in the trial and assisting his attorney if he wants to. It also suggests, is he also faking his unfitness on the memory tests? I mean, like I said, the trial judge did not put much information in front of him, but it was information properly before him that could be determined for what it's worth, and he said it wasn't worth much. But, again, you take all the evidence that was before the judge. You have the defendant's conduct in this case. You have his conduct in the other cases that the trial judge takes notice of with the agreement of defense counsel. You have this expert who says he's unfit because he's a danger of disrupting the proceedings. He doesn't say he's unfit because he can't cooperate or assist. And then you have the defendant, after that, appearing in many subsequent hearings before trial, again showing he can assist, and then he testifies as well. The fact that he confesses on the stand, I don't think that that shows he's unfit. He's not the first defendant that gets up on the stand and gives testimony that hangs himself. And it is the defendant's absolute right to testify, and counsel cannot stop him if he wants to. I mean, the counsel has no choice. If the guy insists on going to testify, you have to let him. And his testimony, while rambling, was, showed clear memory, and it really supported the trial court's determination that this guy is fit. He may be odd in other ways, but that's not the standard. The standard is, does he understand the charges? Does he understand the proceedings? There's no doubt about that. And can he assist? And if you take the record as a whole, the trial judge's determination that he could assist was not contrary to the manifest weight of the evidence. You began your argument, Mr. Manchin, by appropriately observing that this is the unusual case. I don't recall seeing one quite like it. The typical issue is, as you put it, was the stipulation properly received, et cetera. If we were to affirm in this case, to what extent are we opening a door's box to a rather activist sort of trial court pursuing this question and going beyond the normal process where you just, for lack of a better way to put it, the trial court's essentially a passive agent and waits for the parties to present evidence to it. The stipulation is sort of sui generis as part of the trial because the trial court is given a duty on his own to raise the defendant's fitness. Plus the statute says the trial court can call its own witnesses and conduct its own investigation. That's a very unusual statutory provision. You've been at this a long time as a lawyer. I've not seen that. That was my question. I've not seen it before and I've never seen it. It's never been challenged infringing on any… Is there some other provision in the criminal law that speaks the same way? As if this were an inquisitorial system, not the adversarial one? Well, no, Your Honor, but again, fitness is unique because the statute also gives the judge the affirmative duty to determine for himself if the defendant is unfit. He also has the duty to raise the question himself if he sees… Sui sponte. Even if nobody else says anything, if he thinks the defendant is wacko, he has to call it and hold the hearing. I think that's the technical legal term. As to Mr. Drake, I was asking about that earlier. Your Honor, was there any evidence that the judge talked directly with Mr. Drake outside of the court process other than to request a letter? The record just shows that he requested a letter and then after presenting the letter to the attorneys, they called him in after relying upon the letter. Your Honor, then in follow-up to what Justice Steinman was just talking about, this statutory process would allow for the trial judge to engage in conversations with folks like Mr. Drake directly? The statute says, call your own witnesses, conduct your own investigation. That would assist to this process. Let me ask this question following up on Justice Sears' question. Is the record clear on how Mr. Drake's involvement in the life of the defendant even came to the attention of the trial judge?  Other than my speculation that he might have been enlisted on the request for appointment of counsel or mentioned by some other way, but I don't recall how he came. He's a former employer? Yes. Was he a current employer, do you know? I think he was a matter of months or weeks between the time he left and the time this offense occurred, so it was a rather recent thing. And getting to my point, the judge didn't just do his own investigation. He told the parties, okay, this is the information I have sourced. This is the files I have requested. Okay, this is what I'm going to do. You can examine it. He informs the parties of what's going on. This is not where he's, okay, I talked to Mr. Drake and this is what he told me. He doesn't rely upon information outside the record that nobody else knows about. He puts it all on the table for the parties to consider at the same time, you know, to object. Okay, this you should not be considering, this you should not be considering. He gave the parties a chance to object or to respond, and with most of it, the trial counsel said, okay, yeah, go ahead and take notice of these current trial proceedings and how the defendant is behaving in those cases in determining whether he's fit here. And I think that's perfectly reasonable to look at. Okay, he's in trial on three different cases.  If he is a model defendant doing everything he's supposed to in those two cases, that really has a strong bearing on is he also fit here. By the same token, if he is unfit in those other proceedings, that is a strong indication that he should be found unfit here. Mr. Manchin, something I forgot to ask Mr. Wimmer was about the motion for a new trial. There was one file here, right? I believe so, and if I am remembering correctly, the motion for a new trial included as an issue the fitness finding made by the trial judge. So did Judge Schick, in the hearing on the motion for a new trial, comment on the defendant's trial testimony as further support for the fitness finding? I honestly don't recall. I do have one final point, if I may. Defense counsel said that if the trial court's finding was incorrect, we should be remanding for a new trial. That is not the standard. The standard would be for a new fitness hearing, and then only if the retrospective fitness hearing finds that he is unfit do we have a new trial. We would go back for a new fitness hearing rather than a new trial if the court finds that the judge overstepped his bounds here. But I don't think this is a case where the court was prejudiced against the defendant or that he had predetermined that the defendant was fit. The trial court was simply trying to do his duty of making sure that this guy was fit in face of an expert who never, ever said that the defendant could not assist his attorney. Thank you. Thank you, Mr. Manson. Mr. Weber, rebuttal argument? Thank you, Your Honor. Briefly, with regard to the first claim, as opposing counsel points out, there was obviously Stiefel's demonstrated adequate rote memory. He didn't have amnesia or anything like that. But Dr. Frey never opined that he had any problem with his rote memory. It was his memory with interference that was the issue. His ability to deal with one subject, transition to another subject, and maintain focus and concentration appropriately throughout those changes. Secondly, again just briefly on the first issue, opposing counsel notes at points that Stiefel's behavior in the courtroom wasn't sufficient on its own to demonstrate unfitness to stand trial. Stiefel admits that people who are fit to stand trial can behave as he does in the courtroom. It's important to remember that this is against the background of the only psychiatric opinion in this case, being that he's not fit to stand trial. The question isn't whether his behavior in the courtroom shows he's unfit. It's whether it provides a basis for rejecting the only expert opinion that was presented at the fitness hearing. Moving on to the second claim, the issue here is not whether or not the trial court improperly presented evidence outside of statutory procedures or something like that. Regardless of whether or not the court is obeying proper rules for presentation of evidence, which always under Illinois Supreme Court Rule 614 allows for the court to present its own evidence in any evidentiary proceeding. The issue is instead whether the trial court in its exercise of that authority has abandoned its neutral role and taken on essentially the role of advocating for a particular position. Now, opposing counsel noted correctly that when the trial court first appointed Dr. Marilyn Marks for her to conduct this examination, it stated it was erring on the side of caution. It didn't believe that it needed to, and at that point it was clear it didn't think that there was a bona fide issue that would have required a fitness hearing or indeed required appointment of counsel. What's important for present purposes, though, is what the court says when it begins this hearing. It changes to a slight degree what it's saying about its prior observations. It now says that its appointment of Frey, quote, it wasn't based upon any observations. Actually, it was contrary to the observations of the court. The doctor reports, Dr. Frey's report, the findings in and of itself that he wasn't fit and needed medication. I believe that to protect Mr. Stieple's due process rights, I needed to hear all the evidence. I needed to review transcripts of his history, his ability to get along, unquote. Now, it's entirely fine and indeed probably unavoidable for the trial court to be surprised if he gets back an opinion that a defendant's not fit when he initially just appointed, you know, somebody out of an abundance of caution. Furthermore, as Your Honor noted previously, it's entirely appropriate for the trial court to rely on his own observations of the defendant in determining whether or not he's fit. And if those observations were, in fact, contrary to Dr. Frey's report, it would have been entirely consistent with the due process clause for the trial court to open the hearing, receive Dr. Frey's opinion, and if the parties didn't even want to present any more evidence, simply find him fit and reject Dr. Frey's opinion on the basis of his own observations. The problem here is that the trial court, rather than just relying on its own observations, begins the hearing by saying that, you know, basically I think Dr. Frey is wrong because of what I've seen, and then presenting a large volume of evidence he's investigated himself essentially to back up his own observations. At that point, it's clear. I mean, the trial court is essentially advocating for a position. It is indicated that it's taken on the basis of its own observations. What was the evidence presented? The evidence presented was his disciplinary and medical records from IDOC. Mr. Drake's testimony, he was presented as a court's witness. The transcripts of prior hearings were nominally admitted as a state exhibit, but the state didn't talk about them very much in closing argument, and it was the trial court that first obtained them. You heard the questions we raised to Mr. Manchin about identifying Mr. Drake. Do you have any additional information on that? No, Your Honor. Well, what if the court simply said, pursuant to the statute, I want some additional information about this guy as opposed to providing me further explanation? Would that have been improper? I don't believe so, Your Honor. In that case, I mean, obviously, any time the court, you know, essentially solicits additional evidence, things can get a little troubling. But in that case, you're actively sort of leading things up to the parties, flagging, you know, what you believe potential issues are, and ultimately, you know, sitting in the role of receiving evidence rather than presenting it. If you had still had this statement at the beginning of the hearing, basically, that, you know, I've already decided. What if the court said, I don't know what the evidence would be, but I want, you know, he's been in the joint. Let's get his disciplinary records and at least find out what his last employer, recent employer had to say. Would that have been improper? Again, it's an abuse of discretion standard, so it would be a question of whether or not that alone in conjunction with other statements demonstrated bias. On its own, I don't think so. So unless there are any further questions. I don't see any. Thank you. Thank you both. The case will be taken under advisement and written decision. Thank you. Thank you. Thank you. Thank you. Thank you. Now. Oh, gotcha. Got you. Okay. This is Mr. Steffens. Oh. He might have heard you again. No. There he is. I don't know if he. No, there he is. All right. Good morning. Mr. Mott, you may proceed. And good morning, Your Honors. May it please the Court. Your Honors, this case was about the possession of methamphetamine manufacturing materials. But an undue amount of attention was paid during the trial to this BB gun, which was totally irrelevant to the charges at hand and this unfairly prejudiced Mr. Albertson. Now, the presence of this BB gun had absolutely nothing to do with the possession of methamphetamine manufacturing materials charges. It did not make any consequences of that possession more or less likely. Simply put, possession of a weapon did not show that he possessed any of these materials, did not lead to the discovery of any of these materials. It simply had nothing to do with the charges at hand. And importantly, the possession of the weapon or the video segment showing this did not – it was not part of the continuing narrative. It did not explain why the officer did what he did. Officer Dobson testified that he was arresting Mr. Albertson based on his outstanding warrant, which is the reason he was approaching the vehicle on the passenger side at the beginning. And in addition, the BB gun – the presence of the BB gun did not explain why Ms. Metcalf was interviewed at the scene, as the State pointed out in that brief. Presumably, both parties would have been interviewed regardless of whether or not this was there, and the State doesn't explain why Mr. Albertson having the BB gun led to Ms. Metcalf being interviewed. That just – that had nothing to do with the charge. In the State's brief, it mentions that the possession of the weapon was drug possession more likely. But there's no evidence of that, and there's no support for that in the case file. There are cases in the scene that the presence of a firearm, along with other circumstantial evidence, can lead to an inference of drug dealing or the intent to deliver in controlled substance cases. Well, how about this as a thought? Generally speaking, citizens, jurors, understand that there are now cameras, either body cameras or squad car cameras, concerning stops. And the jury is thinking, okay, there's a stop here. I'd like to see what happened and how it happened. And the second thing is the cops would testify. I came across this guy in the scene and arrested him and put him on the ground and cuffed him. It seems to me that the jury might wonder, well, why'd you do that? Why, you know, that might sound harsh or, you know, a problem. Whereas if the police see something that looks like a gun, even though it ultimately appears to be a beating gun, that might serve to explain why they were concerned initially, why they did what they did. And then given the instructions the court gave to the jury about, by the way, folks, this was a beating gun, and it was not a crime in Illinois, and he was not charged with having that crime. Why isn't it reasonable to think, well, this explains the police behavior and also addresses the jurors' expectation of the camera of the events occurred. And this instruction to the jury pretty much solves what would be the prejudice the defendant might suffer absent that instruction. I think there are two parts to your honest question. I'm going to address the second part first. Okay. The stipulation about the gun. It might have served to minimize the impact, but it certainly did not cure all of the impact. Though the jury was told it's not a crime to possess this, I'm sure they still wondered, why do we keep hearing about it? What does this have to do with this case? And the fact that it was emphasized so much in this case, the prosecutor referred to it in their opening statement, Officer Dodkin's statement. You're now speaking to the jury's curiosity, wondering why things are there. I'm sure they wondered, what is this beating gun have to do with anything? The answer is nothing. But the fact that it kept getting talked about carries weight in the jury's mind. They must have assumed it means something. Give me the worst-case scenario of the way it would carry in the jury's mind in view of the instruction the court gave. I didn't hear the first part. Sorry. Give me the worst-case scenario. You're a juror. What's the worst thing you're going to think about this, given that the court has now told you, one, it's a beating gun, two, he's not charged with that crime, and it's not a crime? What are you going to make of all that stuff? You're going to make of it exactly what the prosecution intended. The inferences that come with possessing a weapon and being accused of possessing drugs. The term to lump it in is, he's a bad guy. He's got this weapon, he's probably got the drugs, too. So he's a bad guy because he's got a beating gun in the car? It's a weapon. It's not that he's carrying some kind of weapon next to him while he has his. It's the whole inference, trying to paint him as a dangerous person, engaging in these dangerous activities. So let's say you're right, that it was there. That doesn't end the inquiry here, right? What was he convicted of? He was convicted of possession of methamphetamine manufacturing materials. So, assuming that it was there, it was harmless there. So, is it reasonably probable that the jury would have acquitted him but for the evidence of the beating gun? It is reasonably probable. Why? Well, as one evidence that the jury acquitted him of the other count, the possession of methamphetamine precursor, when the evidence on the two was essentially the same. It was a list, but a presentation of all of the different items found in the vehicle and officer's testimony about what they're used for in the process of manufacturing methamphetamines. Yet, the jury acquitted him of the pseudoephedrine but convicted him of the other materials when the evidence as to why they were there, who procured them, was essentially the same. There was no meaningful difference. Is that the best you have in terms of the argument that he likely would have been acquitted? That's one argument. Another argument is that the only evidence as to intent, which was an element here, the evidence of intent came only from Ms. Metcalf, who she had agreed to plead guilty but had not yet been sentenced. So, her testimony was that of someone who was required to cooperate with the state in order to get a better deal for herself. So, that in itself makes her testimony suspect. In addition, she was essentially a co-defendant in this case. And as examiners know, it wasn't given in this case, but there is a jury instruction that essentially you should treat co-conspirator testimony or co-defendant testimony with caution because, you know, for the obvious reasons that they will say what they need to say to protect themselves and the other person. In addition, your honors, nearly all of these items are common household items and there was evidence that these two were moving from one home to a new home. So, they had all of their belongings, all of their worldly possessions, packed inside this vehicle. It wasn't like they were driving around with a bag that said, and it was all crammed in one single location. They were found all over the car. Tablets, lithium batteries, drain cleaner, crystal lye, salt, cold packs, rubbing alcohol and coffee filters. So, you know, I don't know about your typical moving or packing list, but that seems like a pretty unusual load of household materials to have inside your car. Well, I respectfully disagree, your honor. There's nothing unusual about coffee filters or salt or rubbing alcohol or even drain cleaners. Those are all common household items. Again, crystal lye, it's a common chemical that can be bought at various places. Obviously, the more of them you put together, yes, an inference starts to build and I understand that, but the point is it's not like these were all in what, they were strewn all over the vehicle along with lots of other things. If your honors saw the video, you can see this, the vehicle was crammed, every cubic inch of this vehicle had stuff in it. There were lots of other things besides these chemicals, these materials inside the vehicle. So it's not simply the case that they were driving around with a mobile meth lab in a box in the back just waiting for this. They had lots of other things. So given all of this evidence and the fact that the jury, like I said, acquitted him of one charge when the evidence was essentially the same, it is reasonably probable that the jury would have acquitted him if the prosecution hadn't so consistently focused on this detail. It simply had nothing to do with anything. And moreover, your honors, the prosecutor and the officer used the word firearm repeatedly. When everyone in the room except the jury at the time knew it was not a firearm, it's a BB gun, and yet there appeared to be a firearm, a CO2 firearm. Why keep using the word firearm, which has a much stronger feel to it than BB gun, when you know it's not a firearm? It was misleading, it was unnecessary. And getting back to what Justice Segment asked earlier, the jury wants to know why certain things happened. In every case, the jury wants to know why everything happened. But we have rules about what they can hear and what they cannot hear. That's something that has to be relevant in order for the jury to hear, but it has to serve some purpose. And the video clip showing the BB gun falling out simply served no purpose in this trial but to unfairly prejudice its relevance. What was the court's actual ruling in terms of the BB gun being depicted in the video? Because I see that the court stated that the attorneys come up with a stipulation to be read to the jury regarding the BB gun, but what did she actually say? What was her ruling? Well, there was a motion to eliminate on the entire video, and each segment was challenged, and the parties essentially compromised. At first, the defense attorney had hearsay objections to lots of the audio, so the parties agreed to not play the audio or any of the video, which eliminated her hearsay. But she made clear that did not cure her problems with showing the BB gun. And after hearing both parties, the judge essentially said, I'm going to allow the state to present the video as presented in their motion. So there wasn't a lot of specificity in terms of the judge saying, I find the BB gun more probative than prejudicial or anything like that. It was kind of just a general state can play the video. Did the defense specifically object to the depiction of the BB gun? Yes, it was part of the hearing on the motion to eliminate. That segment number two of the video that was shown was the part with the video, and defense counsel absolutely objected to it not being relevant, being prejudicial, all of those things. Is the defense ever a fane of ruling as to that specific objection as to the BB gun? Well, the judge said, I'm going to allow the state to play it, so presumably that's overruling the defense's objection, I guess. She did not probe for any more specific language about multiple findings within that. It was just kind of a general state can play the video as presented. And in the state's brief, they talked about this being forfeited for various reasons. As I said, this was all passed out in the motion to eliminate. It's fully litigated, so it is our position that this is all fully preserved. And the state was in their brief attempted to split the segment number two into the part where the BB gun falls out and the officer's reaction to that, but it's in separate portions. They were never treated separately. It was all always considered one segment of this video, so I believe the state's position that forfeiting an argument as to the latter 30 seconds of that segment is not well taken. And then also as to the state said that Mr. Albertson has forfeited his arguments regarding mentioning the word firearm over and over again. I'm not raising that as a stand-alone issue because that was not objected to. That would have been forfeited. I'm simply pointing out the prejudice it had, the effect it had on the jury because of the repetition of the use of the word firearm and adding to the inference that Mr. Albertson was a dangerous person who would be involved in a murder. For those reasons, Your Honor, we believe showing this portion of video was entirely irrelevant and unfairly prejudicial to Mr. Albertson and that the state was unable to show that it was harmless in this case. For those reasons, we ask that you remand for a new trial. Thank you, counsel. Ms. Jefferts? The court did not abuse its discretion in admitting the challenged evidence. The evidence was not unduly prejudicial and any possible error would be harmless. The evidence clearly showed that the BB gun was not a firearm but, in fact, was only a BB gun. The jury could not have concluded that it was anything other than a BB gun which the defendant lawfully possessed. What about this claim of Mr. Monk that the prosecutor took on emphasizing a gun or a firearm was not good? Is that correct in this record? The state would argue that the record does not show that the prosecution did not emphasize that it was a firearm. The only mention of the firearm was in explaining how it appeared to the officer. And, in fact, in the very beginning, the first references to the object at trial, the prosecutor said an opening statement and then Officer Dobkins testified only that it appeared to be a firearm. And then Dobkins was the first witness. He testified that the object was a BB gun. And, in viewing the video, the jury could see for themselves that when the object fell from the passenger side of the vehicle, it appeared especially in the dark, which is when the stop occurred at night, it appeared to be a firearm. So, after viewing the video, the jury was again told by stipulation that the gun was a BB gun. The defendant's possession of the BB gun was not a crime and that he was not charged with a crime for possessing it. And the prosecutor accurately stated in closing argument, just explained the circumstances of the defendant's arrest and why the stop started as a traffic stop then turned into something else and said Dobkins approached the passenger side to get the defendant out of the vehicle to put him under arrest for the warrant. The BB gun fell down. At that time, Dobkins thinks it's possibly a real gun, so he immediately puts the defendant in handcuffs, puts him in a squad car until he determines what's going on with the firearm. After he determined that it was a BB gun, he then approaches the driver and asks her to step from the vehicle so a speeding stop has now turned into a stop that's being prolonged for legitimate reasons. So that's how it was presented at trial. The only references to it being a gun or a firearm were in the context of how it appeared initially to Officer Dobkins. But then the jury was immediately told that it was in fact a BB gun. What was the evidence supporting the defendant's conviction here? It was the driver's testimony. Also, the driver was the defendant's girlfriend. She testified that she purchased at the defendant's request the pseudoephedrine and other meth-making materials. She also testified the defendant placed the drain cleaner where the passenger door panel had been. The defendant was sitting on the passenger side of the vehicle. She also testified the pseudoephedrine was in open view and accessible to both of them between the seats, that she and the defendant were going to use the items to make meth. And they were going to do that by the defendant was going to put the stuff in the bottle and she would help hold the funnels. So that was her testimony. There also was Officer Luster's testimony that, as you mentioned, Justice Harris, that the vehicle contained all the items needed for a complete methamphetamine-producing laboratory except for two, Coleman Camp Fuel and Abstinacid, which typically was some type of liquid drain cleaner. So the officer also testified that the defendant had been blocked at least twice in the past year when he attempted to purchase more than the legal limit of pseudoephedrine in a 30-day period. Given that evidence, how did the jury acquit on the one count? Hard to tell what the jury does. To speculate, it was the defendant's girlfriend who purchased the pseudoephedrine. It's possible that maybe they thought that he was the one who really was responsible for that. Given the jury's acquittal, what's your response to Mr. Munn's claim that if there was error, which he claims, to let in any reference to a gun at all or the videotape, then it's not harmless error because maybe they would have acquitted him of everything. Well, why would it make a difference? That's why it's the gun relevance or the BB gun relevance as to one and not the other. It wouldn't make a difference. I think the question is what if it isn't relevant? It was allowed in and thus it's error. Well, if it's error as to one, if they would have acquitted on the one and not the other, it wouldn't logically make a difference. It would have acquitted on all accounts if it really made a difference as to in their equivalent on the pseudoephedrine. But, of course, we would argue that it wasn't prejudicial. And, of course, the standard on review is abuse of discretion, as your honors are aware. It's a pretty hard standard for a defendant to meet. He has to show that the trial court's ruling was arbitrary, fanciful, unreasonable, such that no reasonable person could take the view without the value of the trial court. Well, assuming that there's not much probative value or not much prejudicial effect, let's change it that way, what is the probative value? The probative value would be, of course, we argued a couple of bases, and I would emphasize the basis that was used at trial, and that was to show the circumstances of the stop and defendant's arrest. And, as your honor mentioned, excluding it would be illogical. The tape was shown. If that part was taken out, the defendant would disappear from the car on the tape. What were the circumstances of the stop that were in doubt or the tape was designed to clarify? It started out as a speeding stop. And then once the gun was discovered, there's another basis, or what appeared to be a gun, and Officer Dobkinson immediately took him to custody. And also, as was argued at trial, it showed why the defendant was not questioned on the roadside as the driver was. He disappeared from view. So there was a basis for this. It was not emphasized. It was not portrayed to the jury as the defendant is a bad guy. When your honors view the video, you'll see that it doesn't show the officer. It's a body cam video, and so it shows the defendant's fearfulness. It doesn't show, as Cousin Cussel argues, that the officer was somehow afraid of the defendant, that he was a bad guy, or he was a dangerous criminal who had this weapon. So the evidence of the defendant's guilt, we would say, is overwhelming. The defendant wasn't prejudiced. He wouldn't even have to get to harmless error, but that it was harmless error, and that there was no reasonable probability that the jury would have found the defendant not guilty if it hadn't been intended. So unless there's any further questions, we simply ask that you confirm. Thank you. Mr. Mundt, rebuttal argument?  As to the state's response on the last part about how this clip of the gun explained the traffic stop, that's simply not the case. Officer Dobson says he stopped the vehicle for speeding. He got their information. When he ran the information, the driver had a suspended license, and the passenger had an active felony warrant. That was the reason the traffic stop changed character at that point, because both the driver and the passenger had reasons to be stopped and removed from the vehicle and arrested. The BB gun simply had nothing to do with why the officer did anything else he did in this case. More importantly, the video of it doesn't explain why he did anything or did not do anything. It was simply something that happened along his way to arrest Mr. Elwood. The standard is that no reasonable judge in the position of the trial court here could have taken the position that this might be of interest or relevant to the jury. Isn't that what we'd have to conclude otherwise to agree with your appeal? It's not that it's of interest to the trier of fact. It has to be relevant to the charges, Your Honor. Relevant to the circumstances of the case. The circumstances of the arrest, I think, would almost always be relevant to the jury's understanding of the case. But the jury's interest is not the same as relevant to the charges at hand, Your Honor. I'm sure the jury would always love to know the entire history of the defendant in his case and how it got there. The question they were being asked to decide was, did Mr. Albertson possess these materials with the intent to manufacture them as amendments? He was being arrested because he had a warrant. Not because of this gun, not because of anything up to that point. Once they were removed from the vehicle, the evidence of finding all of the items in the car, that's relevant. That's what the jury needed to be told about. But why Mr. Albertson was removed from the vehicle has nothing to do with what the jury was being asked to address. And in response to counsel's argument as to prejudice, she's correct. We don't know why the jury acquitted on one but convicted on the other. It's possible they were trying to come to a break and thought maybe signing on one count would be different than both. We simply don't know. But the point is, the jury found it correct to acquit on one of these charges when the evidence was essentially the same. So I don't think a panel or someone looking at this can say there's no chance a jury would not have acquitted on the other charge. There's no chance. It's a substantial probability or reasonable probability. It's harmless if we think that the jury is not going to have affected the verdict, isn't it? That's correct. But we simply don't know that considering we don't know why the jury did what they did in this case. And more importantly, a harmless error would never exist because we don't know that ever. We have to use our best judgment. Otherwise, there would be no way of finding that any error is ever harmless. Yes, it's an amorphous standard. As I said in my brief, Mappet v. Bliss in a fellow court case from this course in 2002, says if the evidence at issue has slight probative value, any prejudicial effect of that evidence may require reversal. What happens is the evidence was close. It was not strong. And if we don't know what effect this error had, we have to reverse because we don't know that it did not affect the outcome. So since the BB gun was simply completely irrelevant, any prejudicial effect it had requires reversal. For those reasons, Mr. Albertson requests a remand for a new trial. Thank you. Thank you both. The case will be taken under advisement and a written decision shall issue.